UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

TARA RANIERE, NICHOL BODDEN, and,
MARK A. VOSBURGH, on behalf of themselves
Individually, and on behalf of all
similarly-situated persons,

                Plaintiffs,                    11 Civ. 2448

   -against-                                 OPINION

CITIGROUP INC., CITIBANK, N.A., and
CITIMORTGAGE, INC.,

                Defendants.

------------------------------------------X

A P P E A R A N C E S:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11-22-11

      Attorneys for Plaintiffs

      THOMPSON WIGDOR LLP
      85 Fifth Avenue
      New York, NY  10003
      By:  Douglas Wigdor, Esq.
           David Gottlieb, Esq.
           Kenneth Thompson, Esq.
           Stephen Vargas, Esq.

      Attorneys for Defendants

      MORGAN, LEWIS, & BOCKIUS LLP
      101 Park Avenue
      New York, NY  10178
      By:  Sam Shaulson, Esq.
          Ellyn Pearlstein, Esq.

**Sweet, D.J.**

In this action, the plaintiffs Tara Raniere ("Raniere"), Nichol Bodden ("Bodden"), and Mark Vosburgh ("Vosburgh") (collectively, the "Plaintiffs") have brought this action against Citigroup Inc., Citibank, N.A., and CitiMortgage Inc. (together, "Defendants" or "Citi") to recover allegedly uncompensated overtime wages as well as liquidated damages. Plaintiffs also seek certification of a putative nationwide collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. as well as a New York class action under the New York Labor Law ("NYLL") § 190 et seq.

This opinion addresses three motions: (1) Defendants' motion to dismiss or, in the alternative, transfer or stay this action; (2) Plaintiffs' motion for conditional FLSA certification, Court-facilitated notice to similarly situated persons, and expedited disclosure of potential collective members' contact information; and (3) Defendants' motion to compel arbitration of the claims brought by plaintiffs Bodden and Raniere.

Based upon the following, Defendants' motion to dismiss, transfer, or stay is denied; and Defendants' motion to

1

compel arbitration is denied; and Plaintiff's motion for conditional collective certification and related relief is granted.

## Prior Proceedings

This action was commenced by Plaintiffs on April 8, 2011. On May 3, 2011, Defendants filed a motion to dismiss, or in the alternative, stay or transfer this action. On May 6, 2011, Plaintiffs filed a motion for conditional collective certification and related relief. On May 13, 2011, Defendants filed a motion to compel arbitration. These motions were marked fully submitted on June 7, 2011.

## Facts Alleged[1]

This suit was brought by Raniere, who has been employed by Defendants as a "Home Lending Specialist" since June 8, 1981,[2] Bodden, who has been employed by Defendants as a "Home Lending Specialist" since February 6, 1987, and Vosburgh, who was employed by Defendants as a "Loan Consultant" between

---

[1]    Unless otherwise noted, the allegations set forth here are drawn from the Complaint.
[2]    The Complaint states at one point that Raniere was employed as a Home Lending Specialist since June 8, 1981 (Compl. ¶ 14), while in another it alleges she has been employed in that role since June 9, 1981 (Compl. ¶ 21). Neither date affects the instant motions.

October 30, 2002 and February 2, 2009.   The Complaint alleges that each of the named Plaintiffs is a resident of Suffolk County, New York.

According to the Complaint, Defendant Citigroup Inc. is a global financial services holding company providing financial products and services, including consumer banking and credit, corporate and investment banking, securities brokerage, and wealth management. (Compl. ¶ 18.)   As alleged, Defendant Citibank, N.A. is a subsidiary of Citigroup Inc. and a global financial services company that offers financial products and services, banking, lending and investment services.   Defendant CitiMortgage Inc. is likewise a subsidiary of Citigroup Inc. and provides mortgage products and services and other financial services including banking, insurance, asset management, and credit cards.   Both Citigroup Inc. and Citibank, N.A. are Delaware corporations with principal places of business at 399 Park Avenue, New York, New York (Compl. ¶ 18-19), while CitiMortgage Inc. is a New York corporation (Compl. ¶ 20).

Plaintiffs allege that Citi willfully violated the FLSA by failing to pay Plaintiffs and other members of the putative FLSA collective the prevailing one and one-half times their regular rates of pay for hours worked in excess of 40

hours per week. Plaintiffs assert that pursuant to Citi's policies and practices, the members of the putative collective were improperly classified as exempt from the provisions of the FLSA and improperly denied overtime compensation to which they were entitled.

According to Plaintiffs, while their "job titles changed frequently throughout their employment," "their job duties have never materially changed." (Compl. ¶ 24.)[3] As part of their duties while employed by Defendants, Plaintiffs "would complete mortgage applications for CitiMortgage's customers," which were "primarily referred to Plaintiffs by other Citi employees." (Compl. ¶ 25.) Plaintiffs "would collect financial information and documents from a particular customer and would enter the financial information into Defendants' computer software," termed "Contact Manager," which would then identify whether the customer was conditionally approved for a particular mortgage based on the provided financial information. (Compl. ¶ 26.) Plaintiffs would "notify the customer whether he or she was conditionally approved for the particular mortgage" and "[i]f the customer was conditionally approved for the mortgage, Plaintiffs would request additional financial documents from the

---

[3]      Plaintiffs specifically allege that "[o]n April 30, 2009, Plaintiffs' job titles changed from 'Loan Consultant' to 'Home Lending Specialist.'" (Compl. ¶ 24.)

customer to satisfy the conditions set forth from Contact Manager." (Compl. ¶ 27.) "Plaintiffs would then notify a Processor to review the customers' mortgage application," and "[a]fter a review of the mortgage application and documents, the Processor would forward the mortgage application to an Underwriter for approval." (Compl. ¶ 28.) According to the Complaint, "Plaintiffs had no authority to approve or disapprove a mortgage application; instead, Plaintiffs followed Citi's internal processes to gather necessary information and documents for a customer's mortgage application to be processed." (Compl. ¶ 29.) Additionally, Plaintiffs assert that they "did not customarily or regularly direct two or more persons" and "they had no management responsibilities." (Compl. ¶ 30.)

According to the Complaint, prior to July 18, 2010, Plaintiffs were not required to record their time spent working, and as such Defendants did not maintain records concerning Plaintiffs' hours worked. (Compl. ¶ 35.) However, Plaintiffs allege that throughout their course of employment, they "worked substantially in excess of 40 hours per week, frequently working between 50 and 70 hours per week" (Compl. ¶ 36.), and that Defendants offered or permitted Plaintiffs to work such overtime hours. (Compl. ¶ 37.)

Plaintiffs contend that until on or about September 1, 2010, they were not paid overtime compensation for hours worked in excess of 40 hours per week (Compl. ¶ 38). "[O]n or about September 1, 2010, Plaintiffs began receiving some compensation for overtime hours worked," however, "this compensation falls short of what is required under the FLSA and NYLL overtime provisions." (Compl. ¶ 39.)

Following the commencement of this action, four additional individuals -- Allison Singer, David Hind, David Halasz, and Lori Lesser -- filed notices of consent to opt-in to this action. (See Gilly Aff., Ex. C (Dkt. No. 18).) As of the date of the filing of this Order, four additional notices of consent have been filed: by Edward Gajdosik (Dkt. No. 65), Bissera Paskaleva (Dkt. No. 70), Karen Shuldiner (Dkt. No. 71), and Kimmy Jackson (Dkt. No. 72).

**Discussion**

**I. Defendants' Motion to Dismiss or, in the Alternative, Stay or Transfer this Action is Denied**

Defendants have moved to dismiss or, in the alternative, stay or transfer this action on the basis that before Plaintiffs tiled their complaint, a different plaintiff

in the Southern District of Florida filed an action styled as a nationwide collective under the FLSA, likewise claiming that CitiMortgage loan officers were denied overtime compensation for all hours worked over forty per work week. (Defs. MTD Mem. 1 (citing Ursula Corgosinno, on her own behalf and others similarly situated v. CitiMortgage, Inc., No. 11-60613-CIV-COHN, S.D. Fla.) (Dkt. No. 13).)[4]

According to Defendants, the two complaints assert "nearly identical FLSA claim[s], overlapping purported class definitions and claims, and the same legal issues." (Id.) As such, Defendants argue that this action should be dismissed under the first-filed rule or alternately transferred to the Southern District of Florida or stayed until the Corgosinno litigation is concluded. (Id.) For this proposition, Defendants cite 800-Flowers Inc., v. Intercontinental Florist, Inc., 860 F. Supp. 128, 131 (S.D.N.Y. 1994); Goldberger v. Bear, Stearns & Co., No. 98 Civ. 8677, 2000 U.S. Dist. LEXIS 18714, at *5 (S.D.N.Y. Dec. 28, 2000); and Comedy Partners v. Street Players Holding Corp., 34 F. Supp. 2d 194, 196 (S.D.N.Y. 1999). The rule referenced by Defendants, however, is not so rigid as

---

[4]    For ease, the parties' briefing regarding Defendants' motion to dismiss, transfer or stay will be denoted "MTD Mem." The briefing regarding Defendants' motion to compel arbitration will be cited as "Compel Mem." And the memoranda regarding Plaintiffs motion for conditional certification will be denoted "Cert. Mem."

they would have it and does not warrant dismissal, a stay, or transfer here.

As a general rule, "'[w]here there are two competing lawsuits, the first suit should have priority.'" First City Nat'l Bank & Trust Co. v. Simmons, 878 F.2d 76, 79 (2d Cir. 1989) (quoting Motion Picture Lab. Technicians Loc. 780 v. McGregor & Werner, Inc., 804 F.2d 16, 19 (2d Cir. 1986)) (alteration in original).  This rule "embodies considerations of judicial administration and conservation of resources" by avoiding duplicative litigation and honoring the plaintiff's choice of forum.  Id. at 80.

"As part of its general power to administer its docket, a district court may stay or dismiss a suit" where it is "duplicative of another federal court suit." Curtis v. Citibank, N.A., 226 F.3d 133, 138 (2d Cir. 2006).[5]  In considering the "complex problems" that multiple federal filings can produce, the Second Circuit has noted that there is no "rigid test" but instead that a district court is required to "consider the equities of the situation when exercising its discretion."  Id.

---

[5] As with res judicata challenges, arguments on this ground may properly be made via a motion to dismiss. See, e.g., Vega v. Rell, No. 09 Civ. 737, 2011 WL 2471295, at *11-*12 (D.Conn. June 21, 2011); New Hyde Park Car Care Center, Inc. v. Cumberland Farms, Inc., No. 09 Civ. 1535, 2011 WL 2462753, at *2 (E.D.N.Y. June 17, 2011).

at 138. "A court faced with a duplicative suit will commonly stay the second suit, dismiss it without prejudice, enjoin the parties from proceeding with it, or consolidate the two actions." Id. (citations omitted).

The power to dismiss duplicative suits is meant to foster judicial economy and the "comprehensive disposition of litigation" as well as to protect parties from the vexation of concurrent litigation over the same subject. Id. In assessing duplication between claims or actions, "the fact that the first and second suits involved the same parties, similar legal issues, similar facts, or essentially the same type of wrongful conduct is not dispositive." Maharaj v. BankAmerica Corp., 128 F.3d 94, 97 (2d Cir. 1997)(citing S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1463 (2d Cir. 1996)). Instead, "[t]he true test of the sufficiency of a plea of 'other suit pending' in another forum is the legal efficacy of the first suit, when finally disposed of, as the 'thing adjudged' regarding the matters at issue in the second suit." Curtis, 226 F.3d at 138 (2d Cir. 2000) (quoting United States v. The Haytian Republic, 154 U.S. 118, 124 (1894)). As one judge in this district has noted, "[t]he Sixth Circuit has adopted a similar standard, defining duplicative lawsuits as those in which the issues 'have such an identity that a determination in one action leaves

9

little or nothing to be determined in the other.'" <u>Naula v. Rite Aid</u>, 08 Civ. 113464, 2010 U.S. Dist. LEXIS 29699 (S.D.N.Y. March 23, 2010) (quoting <u>Smith v. S.E.C.</u>, 129 F.3d 356, 361 (6th Cir. 1997)); <u>see also</u> <u>Alden Corp. v. Eazypower Corp.</u>, 294 F. Supp. 2d 233, 235 (D. Conn. 2003) ("In determining if the first-filed rule applies, the court must carefully consider whether in fact the suits are duplicative." (citing <u>Curtis</u>, 226 F.3d at 136)).

The <u>Corgosinno</u> litigation and the instant case are not identical. First, following the filing of this motion, the sole plaintiff in <u>Corgosinno</u> filed a notice withdrawing her FLSA collective action, stating that, "[i]n so doing, Plaintiff converts the collective action originally filed into an individual action and Plaintiff will pursue this action on her individual basis only." (Gilly Decl. Ex. 1, at 1 n.1 (citations omitted) (Dkt. No. 30).) At the time of that notice, discovery had progressed on Corgosinno's claims, and a detailed pre-trial schedule, including a trial date, had been set for after the August 5, 2011 discovery deadline. (<u>See</u> Shaulson Decl. ¶¶ 4-6 & Ex. C (Dkt. No. 12)). By that point, the individual plaintiff had taken no action to pursue her case as a collective action, and no additional plaintiffs had opted-in to her single-plaintiff case. (<u>See</u> Gilly Decl. Ex. 3 (Dkt. No. 30)). Because

the Corgosinno plaintiff chose to pursue only her individual claims and withdraw her collective action, there is no threat of overlapping classes through the creation of "nearly identical nationwide collective actions covering the same time period and same CitiMortgage loan officers" (Defs. MTD Mem. 4), nor the possibility of inconsistent judgments and conflicting rulings on conditional certification as Defendants fear.  (See Defs. MTD Mem. 6.)

Furthermore, the instant action names two defendant entities--CitiBank, N.A. and CitiGroup Inc.--in addition to the single defendant, CitiMortgage Inc., named in Corgosinno, and Corgosinno does not include claims regarding a putative New York class, as Plaintiffs' suit does, which would entail, among other things, a different statute of limitations.

Defendants question the Corgosinno plaintiff's filing of her notice of withdrawal, which they describe as "curious." (Defs. MTD Reply Mem. 1.)  Specifically, Defendants point out that Corgosinno filed her Notice of Withdrawal on May 18, 2011, days after Defendants filed the instant motion to dismiss, transfer or stay on May 3, 2011. (See Shaulson Decl., Ex. A (Dkt. No. 54).)  In addition, according to Defendants, "[l]ess than three hours after the Withdrawal filing, Plaintiffs

11

requested that CitiMortgage withdraw the Motion." (Id.) (citing Shaulson Decl. 10-11 (Dkt. No. 54).) Defendants argue that this temporal proximity suggests collusion and forum shopping. (Id. (citations omitted).)

While it is well established that a court may dismiss, transfer, or stay a case where a plaintiff "see[s] a storm brewing in the first court, [and] tr[ies] to weigh anchor and set sail for the hopefully more favorable waters of another district." Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1203 (2d Cir. 1970), there is insufficient ground to attribute such strategic or dilatory tactics to Plaintiffs here. The two actions were commenced by different plaintiffs who were represented by different counsel; and, according to Plaintiffs, this action was initiated without knowledge of the Corgosinno litigation. (Pls. MTD Opp'n 8.) This is therefore not a case where a Plaintiff sees a storm brewing and attempts to set sail for more favorable waters. Furthermore, in response to Defendants' inquiry, counsel for Plaintiffs stated that "categorically . . . we have made no promises or inducements to Ms. Corgosinno, either directly or through her counsel, to obtain the withdrawal of her collective action." (Shaulson Decl. Ex. D (Dkt. No. 54).) Additionally, Defendants provide correspondence from Corgosinno's attorney explaining that "the

12

Withdrawal of the Consent to Join merely memorialized the procedural posture of the case as of the date of the filing: that it was and is a single Plaintiff case, to which no other employee had opted-in, and in which the jointer date had already passed." (Shaulson Decl. Ex. E (Dkt. No. 54).) Prior to Corgosinno's Withdrawal, she had not filed a motion for conditional certification, and Corgosinno's Withdrawal on May 18, 2011 followed the deadline for the joiner of parties on May 12, 2011, as of which no other Plaintiff had opted-in to her action. (See Shaulson Decl. Ex. C at 2 (Dkt. No. 12); Shaulson Decl. Ex. E (Dkt. No. 54).) On these facts, the Court declines to make an inference of forum shopping.

As the two suits are not duplicative, the first-filed rule does not require dismissal of this action, and a transfer or stay is not warranted. The Court accordingly does not address whether the presumption of the first-filed rule is rebutted under either of its recognized exceptions: "(1) where the 'balance of convenience' favors the second-filed action," or "(2) where 'special circumstances' warrant giving priority to the second suit." Employers Ins. Of Wausau v. Fox Entm't Group, Inc., 522 F.3d 271, 275 (2d Cir. 2008) (citing Motion Picture Lab. Technicians Local 780, 804 F.2d 16, 19 (2d Cir. 1986); Remington Prods. Corp. v. Am. Aerovap, Inc., 192 F.2d 872, 873

13

(2d Cir. 1951); First City Nat'l Bank, 878 F.2d 76, 79 (2d Cir. 1989)).

## II. Defendants' Motion to Compel Arbitration is Denied

Defendants have additionally moved to compel the arbitration of the claims of two of the named plaintiffs in this suit, namely Raniere and Bodden.

### A. Legal Standard

Congress enacted the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), in response to widespread judicial hostility to arbitral agreements and the "jealous notion" "that arbitration agreements were nothing less than a drain on [the courts'] own authority to settle disputes." Cooper v. MRM Investment Co., 367 F.3d 493 (6th Cir. 2004) (citations and quotation marks omitted); see also, e.g., AT&T Mobility LLC v. Conception, -- U.S. --, 131 S.Ct. 1740, 1745 (2011). The FAA provides in part:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist

> at law or in equity for the revocation of any
> contract.

9 U.S.C. § 2.  In enacting the FAA, Congress intended to place arbitration agreements on equal footing with other contracts and establish a strong federal policy in favor of arbitration.  <u>See</u> <u>AT&T</u>, 131 S.Ct. at 1745; <u>Perry v. Thomas</u>, 482 U.S. 483 (1987); <u>JLM Indus., Inc. v. Stolt-Nielsen SA</u>, 387 F. 3d 163, 171 (2d Cir. 2004).

Section 4 of the FAA provides that "[a] party aggrieved by the alleged failure, neglect or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.  If a litigant in a court proceeding refuses to arbitrate a dispute within the scope of a valid arbitration agreement, a judicial order compelling arbitration is mandatory, not discretionary.  <u>Id.</u>

The FAA requires courts to "rigorously enforce agreements to arbitrate." <u>Mitsubishi Motors Corp. v. Soler</u> <u>Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 626 (1985) (citation omitted).  In particular, the Supreme Court has roundly endorsed arbitration in the employment-discrimination context:

15

> We have been clear in rejecting the supposition that the advantages of the arbitration process somehow disappear when transferred to the employment context. Arbitration agreements allow parties to avoid the costs of litigation, a benefit that may be of particular importance in employment litigation, which often involves smaller sums of money than disputes concerning commercial contracts. . . . The Court has been quite specific in holding that arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law; as we noted in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991), "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum."

Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 123 (2001).

With this in mind, "[t]o decide a motion to compel arbitration of claims based on statutory rights, a district court must determine only: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable." Mitsubishi, 473 U.S. at 626-28. In addition, generally applicable state-law contract defenses such as fraud, duress, or unconscionability may invalidate arbitration agreements or clauses thereto. 9 U.S.C. § 2; AT&T,

16

131 S.Ct. at 1746; see also 9 U.S.C. § 1; Doctor's Assocs. v. Casarotto, 517 U.S. 681, 687 (1996) (collecting cases); Perry, 482 U.S. at 492 n.9.  Likewise, arbitration of statutory rights will only be compelled "so long as the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitral forum." Green Tree Financial Corp. v. Randolph, 531 U.S. 79, 90 (2000); see also Mitsubishi, 473 U.S. at 637 n.19; In re American Express Merchants' Litig. ("American Express I"), 554 F.3d 300, 315-20 (2d Cir. 2009), vacated sub nom. American Express Co. v. Italian Colors Rest., 130 U.S. 2401 (2010), reaff'd, 634 F.3d 187, 196 (2d Cir. 2011) ("American Express II"); Ragone v. Atlantic Video at the Manhattan Center, 595 F.3d 115, 125 (2d Cir. 2010).

**B. Agreement to Arbitrate**

In this action, Defendants assert that Raniere and Bodden both entered into binding arbitration agreements that encompass their claims in this suit.  Defendants point to Appendix A to CitiMortage's January 2011 U.S. Employee Handbook (the "2011 Arbitration Policy"), which includes the following:

> The Policy makes arbitration the required and exclusive forum for the resolution of all disputes (other than disputes which by statute are not arbitrable) arising out of or in any way

17

related to employment based on legally protected
rights (i.e., statutory, regulatory, contractual,
or common-law rights) that may arise between an
employee or former employee and Citi . . .
including, without limitation, claims, demands,
or actions under the Fair Labor Standards Act of
1938 . . . and any other federal, state, or local
statute, regulation, or common-law doctrine
regarding . . . compensation . . . .

***

Claims covered under this Policy must be brought
on an individual basis. Neither Citi nor any
employee may submit a class, collective, or
representative action for resolution under this
Policy. To the maximum extent permitted by law,
and except where expressly prohibited by law,
arbitration on an individual basis pursuant to
this Policy is the exclusive remedy for any
employment-related claims which might otherwise
be brought on a class, collective or
representative action basis. Accordingly,
employees may not participate as a class or
collective action representative or as a member
of any class, collective, or representative
action, and will not be entitled to any recovery
from a class, collective, or representative
action in any forum. Any disputes concerning
validity of this class, collective, and
representative action waiver will be decided by a
court of competent jurisdiction, not by the
arbitrator.

(Byers Decl. ¶ 3, Ex. 1A at 48-49 (Dkt. No. 28).)


Plaintiffs do not contest that the scope of the 2011
Arbitration Policy properly encompasses the instant dispute or

that Congress did not intend the underlying FLSA claims implicated here to be non-arbitrable.[6]

Accordingly, the Court proceeds to address whether the parties agreed to arbitrate. Mitsubishi, 473 U.S. at 626. A party seeking to enforce a collective action waiver and compel arbitration must establish the existence of an agreement to arbitrate under ordinary principles of contract law. See, e.g., Ross v. American Express Co., 478 F.3d 96, 99 (2d Cir. 2007) (citing Thomson-CSF, S.A. v. American Arb. Ass'n, 64 F.3d 773, 779 (2d Cir. 1995)). Whether the parties agreed to arbitrate a certain matter is governed by state-law principles regarding contract formation. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995); Mehler v. Terminix Int'l Co., 205 F.3d 44, 48 (2d. Cir. 2000). "It is 'well settled' under New York law that arbitration will not be compelled absent the parties' 'clear, explicit and unequivocal agreement to arbitrate.'" Manigault v. Macy's East, LLC, 318 Fed. App'x 6, 7-8 (2d Cir. 2009) (quoting Fiveco, Inc. v. Haber, 11 N.Y.3d 140, 144 (N.Y. 2008)). Where there was no "meeting of the minds," an arbitration agreement cannot be enforced. Dreyfuss v. Etelecare

---

[6]     As discussed below, however, Plaintiffs do contest whether the right to proceed collectively under the FLSA may be waived.

Global Solutions-U.S. Inc., 349 F. App'x 551, 553 (2d Cir. 2009).

i. *Bodden*

Defendants argue that Bodden is bound by the language of the 2011 Arbitration Policy because she acknowledged receipt of the 2011 Employee Handbook on January 14, 2011, including that it required her to submit employment-related disputes to binding arbitration. (Byers Decl. ¶ 4, Ex. 1A (Dkt. No. 28).) This acknowledgement and Bodden's continued employment are sufficient to find that she consented to the 2011 Arbitration Policy, including its class and collective action waiver. See Manigault, 318 Fed. App'x 6 (employee who continued employment after notice of dispute resolution program was mailed to her consented to arbitration, where employee submitted she did not receive notice and did not sign acknowledgement of receipt); Pomposi v. Gamestop, Inc., 09 Civ. 340 (VLB), 2010 WL 147196 (D. Conn. Jan. 11, 2010) (employee bound who executed a written acknowledgement of receipt of arbitration program terms); Arakawa v. Japan Network Group, 56 F. Supp. 2d 349, 352 (S.D.N.Y. 1999) (arbitration agreement in handbook and acknowledgment form signed by employee created binding agreement); DeGaetano v. Smith Barney Inc., No. 95 Civ. 1613,

1996 WL 44226 (S.D.N.Y. 1996) (holding that signed arbitration agreement in employment handbook was an enforceable contract in accordance with New York law); see also Brown v. Coca-Cola Enterprises, Inc., 08 Civ. 3231 (JFB) (ETB), 2009 WL 1146441 (E.D.N.Y. Apr. 28, 2009) (employee bound where he received notice of arbitration program and continued employment); Gonzalez v. Toscorp, Inc., No. 97-civ-8158 (LAP), 1999 WL 595632 (S.D.N.Y. Aug. 5, 1999) (employee bound where he did not sign acknowledgement but did receive handbook and arbitration policy and continued employment); Pls. Opp'n 3-6 & n.2 (acknowledging principle that arbitration agreements may be enforced in the absence of written acceptance based on continued employment after receipt of the arbitration policy).

ii. *Raniere*

Defendants contend that Raniere is also bound by the 2011 Employee Handbook Arbitration Policy because she acknowledged receipt of the 2009 Employee Handbook (Byers Decl. Exs. 4, 5 (Dkt. No. 28)), which included the following provision:

> Citi reserves the right to revise, amend, modify, or discontinue the Policy at any time in its sole discretion with 30 days' written notice. Such amendments may be made by publishing them in the

21

> Handbook or by separate release to employees and
> shall be effective 30 calendar days after such
> amendments are provided to employees and will
> apply prospectively only. <u>Your continuation of
> employment after receiving such amendments shall
> be deemed acceptance of the amended terms.</u>

(Byers Decl. ¶¶ 5-7, Ex. 5A at 48 (emphasis in original) (Dkt. No. 28).)   The parties are in agreement that Raniere acknowledged receipt of the 2009 Handbook. (<u>see</u> Byers Decl. Exs. 4 (Dkt. No. 28).)   That earlier Policy expressly excluded class or collective actions from arbitration, providing:

> Except as otherwise required by applicable law,
> this [Arbitration] Policy applies only to claims
> brought on an individual basis.   Consequently,
> neither Citi nor any employee may submit a class
> action,     collective     action,     or     other
> representative action for resolution under this
> Policy.

(Byers Decl. Ex. 5A at 44 (Dkt. No. 28).)   Citi's Arbitration Policy was modified to include the class and collective action waiver in January, 2011, following the date Plaintiffs have alleged that Defendants reclassified them as non-exempt and began paying Loan Officers overtime pay in 2010.

Plaintiffs argue that Defendants have not established that an enforceable collective action waiver exists with Raniere.   Specifically, Plaintiffs assert that Defendants'

reliance on the 2009 Handbook provision fails because Defendants have not established that Raniere received the 2011 amendments.

As Plaintiffs acknowledge, arbitration agreements "may be enforced in the absence of written acceptance by an employee provided that acceptance is evidenced by something like continued employment after receipt of the arbitration policy." (Opp'n at 3-6 & n.2 (emphasis in original)); see also Brown, 2009 WL 1146441; Manigault, 318 Fed. App'x 6; Gonzalez, 1999 WL 595632. "It is well settled that a non-signatory party may be subject to an arbitration agreement if his subsequent conduct indicates that he has assumed the obligation to arbitrate." Chanchani v. Smith Barney, Inc., No. 99 Civ. 9219 (RCC), 2001 U.S. Dist. LEXIS 2036, at *9 (Feb. 28, 2001) (citing Thomson-CSF, 64 F.3d at 777).

In both Brown and Manigault, courts found that an employee may consent to a modification of employment terms by continuing to work "after receiving notice" of the modification. See Brown, 2009 WL 1146441, at *6; Manigault, 318 Fed. App'x at 8. Similarly, in Gonzalez, the court compelled arbitration absent a signed acceptance because the employee "concede[d] receipt of the [arbitration policy] and chose to continue his employment." 1999 WL 595632, at *2.

23

Plaintiffs argue that, here, Defendants "have produced no proof that Raniere ever received this document or was in any way informed of its contents, let alone that she agreed to its new terms in direct contravention of the 2009 Handbook." (Pls. Compel Mem. 4). The Court of Appeals for the Second Circuit has noted that "[u]nder New York contract law, the fundamental basis of a valid enforceable contract is a meeting of the minds of the parties. If there is no meeting of the minds on all essential terms, there is no contract. This is because an enforceable contract requires mutual assent to essential terms and conditions thereof." Schurr v. Austin Galleries of Ill., 719 F.2d 571, 576 (2d Cir. 1983) (internal citations and quotation marks omitted)). In Opals, the Court found that while each party had signed an agreement to arbitrate, because one included a provision to arbitrate in New York and the other California, as this was an essential term, no valid agreement existed. Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362, 371-72 (2d Cir. 2003); see also Dreyfuss, 349 Fed. App'x at 554-55 (holding that missing pages to an arbitration agreement rendered it unenforceable because the terms of the contract could not be proven).

By affidavit, Citi submits that on December 14, 2011 Raniere received and opened an email with a link to the Arbitration Policy. (Gross Decl. ¶ 4, Ex. 1 (Dkt. No. 60).) That email stated that the 2011 Handbook "will be your primary source for employment and HR policy information" and that the "Appendix to the Handbook contains an Employment Arbitration Policy that requires you to submit employment-related disputes to binding arbitration." (Gross Decl. Ex. 1.) The email additionally provided that

> By receipt of this email, you acknowledge that you've received the Web link to the Handbook and that it's your obligation to read and become familiar with its terms. You further acknowledge your obligation to read the Employment Arbitration Policy carefully and that nothing in the Handbook is intended to constitute a waiver, nor be construed to constitute a waiver, of Citi's right to compel arbitration of employment-related disputes.

(Id.) From the record, it appears that had Raniere indeed followed the link to download the 2011 Handbook, she would have had to acknowledge its receipt as Bodden did, though Defendants have provided no such acknowledgement.

Opening an email that contains a link to a Handbook and arbitration policy, if that link is not followed, is more attenuated and potentially significantly so, than providing an

acknowledgment of receipt of the 2011 Handbook and Arbitration Policy themselves (as Bodden did). This is particularly the case because while Raniere acknowledged receipt of the 2009 Handbook and Policy, that version did not include a class or collective action waiver, and the email which Raniere received in December of 2010, while discussing binding arbitration, did not include any reference to a waiver of class or collective actions.

However, although Plaintiffs submit five declarations with their opposition to the instant motion to compel arbitration, they have not submitted a declaration from Raniere stating that she did not receive the 2011 Arbitration Policy with its class and collective action waiver. It is undisputed that Raniere continued her employment after receipt of the email with the link to the Handbook and revised Arbitration Policy. On these facts, the record is sufficient to evidence Raniere's assent to the 2011 Policy and attendant waiver. See generally, Manigault, 318 Fed. App'x at 8 (employee's continued employment constituted agreement to arbitrate despite her claim that she did not receive the employer mailing and never signed an acknowledgement of receipt); Thomson-CSF, 64 F.3d at 777 (holding that a non-signatory party may be subject to an arbitration agreement if her subsequent conduct indicates that

26

she has assumed the obligation to arbitrate); Brown v. The St. Paul Travelers Cos., 559 F. Supp. 2d 288, 291 (W.D.N.Y. 2008) ("while there is no signed acknowledgment of plaintiff's receipt of the handbook, . . . plaintiff was advised that compliance with the arbitration policy was a condition of continued employment and that it was her responsibility to read and understand all of the company policies including regarding arbitration, and she continued her employment" despite employee's statement that she had no recollection of having received the policy). Plaintiffs have pointed to no case holding to the contrary on similar facts.

Plaintiffs additionally argue that Defendants' "attempt to impose on Raniere a unilaterally altered arbitration policy, without any evidence of her actual assent . . . should be rejected as unconscionable." (Opp'n at 7.)

> "Under New York law, a contract is unconscionable when it is 'so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable [sic] according to its literal terms.' Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1[, 10] (1988). Generally, there must be a showing that such a contract is both procedurally and substantially unconscionable. See id. "The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract[, per se]." State v. Wolowitz, 96 A.D.2d 47 (1983);

27

> see also Desiderio v. National Ass'n of Sec.
> Dealers, Inc., 191 F.3d 198, 207 (2d Cir. 1999)
> ("A contract or clause is unconscionable when
> there is an absence of meaningful choice on the
> part of one of the parties together with contract
> terms which are unreasonably favorable to the
> other party." (quotation marks omitted)).

Ragone, 595 F.3d at 121-22 (quoting Nayal v. HIP Network Servs. IPA, Inc., 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009)). Raniere has failed to show that Defendants engaged in high-pressure tactics or that Raniere lacked meaningful choice such as to constitute procedural unconscionability. See Ragone, 595 F.3d 115. Nor have Plaintiffs argued that the collective action waiver is substantively unconscionable.

## C.  Statutory Rights Analysis

Plaintiffs make two arguments to the effect that the collective action waiver is unenforceable because it would prevent Plaintiffs from vindicating their substantive statutory rights. The first, and broader, of these arguments is that if the waiver is given effect, the FLSA will not serve both its remedial and deterrent functions. Plaintiffs' second, narrower, contention is that to give effect to the collective action waiver and arbitration agreement here would have the practical effect of precluding Plaintiffs from pursuing the enforcement of their statutory rights due to the costs involved.

It is well recognized that employees cannot release their substantive rights under the FLSA by private agreement. See Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707 (1945) ("No one can doubt but that to allow waiver of statutory wages by agreement would nullify the purposes of the Act."); see also Bormann v. AT & T Commc'ns, Inc., 875 F.2d 399 (2d Cir. 1989) ("[P]rivate waiver of claims under the [FLSA] has been precluded by such Supreme Court decisions as Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697 (1945), and D.A. Shulte, Inc. v. Gangi, 328 U.S. 108 (1946)." (citations omitted)).

It is likewise well established that "'[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.'" Circuit City, 532 U.S. at 123 (quoting Gilmer, 500 U.S. at 26); see also Desiderio, 191 F.3d at 205-06. Arbitration of a claim of statutory rights will only be compelled if that claim can be effectively vindicated through arbitration. See Mitsubishi, 473 U.S. at 637 n.19 (noting that if arbitration clause and other contractual provisions "operated in tandem as a prospective waiver of a party's right to pursue statutory remedies," "we would have little hesitation in

29

condemning the agreement as against public policy"); Green Tree, 531 U.S. at 90 (noting that "even claims arising under a statute designed to further important social policies may be arbitrated because so long as the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitral forum the statute serves its functions." (citations and internal quotation marks and brackets omitted)).

Federal substantive law of arbitrability requires federal courts to declare otherwise operative arbitration clauses unenforceable when enforcement would prevent plaintiffs from vindicating their statutory rights. American Express II, 634 F.3d at 199; see also Kristian v. Comcast Corp., 446 F.3d 25, 47-48 (1st Cir. 2006); Hadnot v. Bay, Ltd., 344 F.3d 474, 478 n.14 (5th Cir. 2003); Paladino v. Avnet Computer Technologies, Inc., 134 F.3d 1054, 1062 (11th Cir. 1998); Sutherland v. Ernst & Young LLP, 768 F. Supp. 2d 547, 549 (S.D.N.Y. 2011); Chen-Oster v. Goldman, Sachs & Co., 785 F. Supp. 2d 394 (S.D.N.Y. 2011); DeGaetano v. Smith Barney, Inc., 983 F.Supp. 459, 469 (S.D.N.Y. 1997).

The Second Circuit addressed this issue in American Express I, 554 F.3d 300. The Court concluded that the class action waiver in that case was unenforceable because plaintiffs

30

had demonstrated that they otherwise would not be able to vindicate their statutory rights "in either an individual or collective capacity," id. at 314 (emphasis in original), due to the great expense of pursuing that antitrust litigation and the small individual recovery each plaintiff could expect. As such, the waiver would have the practical effect of ensuring no claims would be brought at all, granting the defendant "de facto immunity from . . . liability." Id. at 320. The Supreme Court vacated American Express I and remanded for reconsideration in light of Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., -- U.S. --, 130 S.Ct. 1758 (2010). American Express Co. v. Italian Colors Rest., 130 S.Ct. 2401. On remand, the Circuit again found the arbitration provision unenforceable because "the class action waiver in this case precludes plaintiffs from enforcing their statutory rights" due to the prohibitive cost of litigating on an individual basis. American Express II, 634 F.3d at 197-99.

In Ragone, 595 F.3d 115, the Court of Appeals again confirmed the importance of the statutory rights analysis, indicating its willingness, if in dicta, to hold unenforceable an arbitration agreement containing a shortened statute of limitations and a fee-shifting provision that would "significantly diminish a litigant's rights under Title VII."

31

595 F.3d at 125–26.[7]  The Court of Appeals discussion in Ragone
demonstrates "that the holdings of American Express apply not
only to 'negative value' class action claims, that is, claims
that are so small in value that it is not economically viable to
pursue them as individual claims." Chen-Oster, 785 F. Supp. 2d
at 408.

Defendants are incorrect that the Supreme Court's
decision in AT&T, 131 S.Ct. 1740, overrules American Express and
Ragone.  AT&T addressed only whether a state law rule holding
class action waivers unconscionable was preempted by the FAA.
131 S.Ct. 1740.  The holdings of both the American Express cases
and Ragone were based, in contrast and as this decision must be,
on federal arbitral law, and AT&T in no way alters the relevance
of those binding circuit holdings.  See Chen-Oster v. Goldman,
Sachs & Co., 2011 WL 2671813 (S.D.N.Y. July 7, 2011) (holding
that AT&T does not abrogate American Express or Ragone and
noting that "it remains the law of the Second Circuit that an
arbitration provision which precludes plaintiffs from enforcing
their statutory rights is unenforceable."  Id. at *4).
Moreover, while the dissent in AT&T noted with concern that
"agreements that forbid the consolidation of claims can lead

---

[7]    The court did not address this issue as the defendants had waived
enforcement of those provisions. Ragone, 595 F.3d at 125.

small-dollar claimants to abandon their claims rather than to litigate," 131 S.Ct. at 1760, AT&T involved the vindication of state, not federal, rights. Thus, even if AT&T is read broadly to acquiesce to the enforcement of an arbitral agreement that as a practical matter would prevent the vindication of state rights in the name of furthering the strong federal policy favoring arbitration, that would not alter the validity of the federal statutory rights analysis articulated in Mitsubishi, Green Tree, American Express[8] and Ragone.  The Court accordingly analyses the present issues under the reasoning articulated in those cases.


i.  *The Right to Proceed Collectively Under the FLSA Cannot be Waived*

The Second Circuit has not determined whether the collective action provisions of the FLSA are integral to its structure and function, and, as such, whether an agreement waiving that right can be enforced.


The First Circuit has expressly reserved decision on this question.  Skirchak v. Dynamics Research Corp., 508 F.3d 49, 62 (1st Cir. 2007) ("We do not need to decide if class actions under the FLSA may ever be waived by agreement. . . . We

---

[8]   On August 1, 2011, the Second Circuit issued an order stating that the American Express panel was sua sponte considering rehearing in light of AT&T. See In re American Express Merchants' Litig., No. 06-1871-CV (docket entry of Aug. 1, 2011).

also do not reach the question of whether such waivers of FLSA class actions are per se against public policy under either the FLSA or the Massachusetts Fair Wage Law"). And while a number of other Circuits have accepted that, at least in principle, arbitration agreements containing waivers of the right to proceed collectively under the FLSA are enforceable, those decisions were either based upon a premise rejected by the Second Circuit or did not reach the question here. See Horenstein v. Mortgage. Mkt., Inc., 9 F. App'x 618, 619 (9th Cir. 2001); Carter v. Countrywide Credit Indus., Inc., 362 F.3d 294, 297-98 (5th Cir. 2004); Vilches v. Travelers Co., Inc., 413 Fed. App'x 487, 494 n.4 (3d Cir. 2011); Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1378 (11th Cir. 2005); Adkins v. Labor Ready, Inc., 303 F.3d 496, 503 (4th Cir. 2002).

Specifically, the court in Caley did not address whether the right to proceed collectively under the FLSA may be waived as a matter of federal law. Instead, it addressed whether such waivers were unconscionable under Georgia state law principles. See Caley, 428 F.3d at 1377-79.[9]

---

[9] The defendants in that case argued that collective action waivers are permissible under Gilmer. See Br. for Defs./Appelees at 57-59, Caley, 428 F.3d 1359. However, as discussed, that argument has been rejected by the Second Circuit.

The Second Circuit has rejected the reasoning relied on in Horenstein, Adkins, Carter, and Vilches. In American Express, the Second Circuit noted that the issue of whether statutorily granted collective action rights under the ADEA, which incorporates by reference the collective action rights granted in the FLSA, could be waived was not decided by Gilmer, 500 U.S. 20, because "because a collective and perhaps a class action remedy was, in fact, available in that case." American Express II, 634 F.3d at 195-96; American Express I, 554 F.3d at 314 (same). Countrywide, Adkins, Horenstein, and Vilches, the latter three relying on Johnson v. West Suburban Bank, 225 F.3d 366, 377 (3d Cir. 2000), assumed that Gilmer resolved whether collective enforcement rights were waivable. See Vilches, at 494 n.4 (citing Adkins, 303 F.3d at 503 (citing Johnson, 225 F.3d at 377)); Adkins, 303 F.3d at 503 (citing Johnson, 225 F.3d at 377); Countrywide, 362 F.3d at 298 (citing Gilmer, 500 U.S. at 32). Under the Second Circuit's precedents, Gilmer does not. See American Express II, 634 F.3d at 195-96.[10] Accordingly, the issue presented by Plaintiffs here, namely whether the right to proceed collectively under the FLSA is unwaivable--beyond such a clause being unenforceable were Plaintiffs to demonstrate that

---

[10]   In so finding, the Second Circuit expressly rejected the interpretations of Gilmer articulated by the Fifth Circuit in Countrywide and the Third Circuit in Johnson. American Express II, 634 F.3d at 195-96.

to do so would have the practical effect of denying them their substantive rights--is an open question in this Circuit.

This issue is fundamentally distinct, and more nuanced, than that presented in Gilmer, which addressed whether ADEA claims are arbitrable at all. Here, Plaintiffs do not contest that individually filed FLSA claims are generally arbitrable or that were the agreement to permit proceeding as a collective in arbitration, as the parties could in Gilmer, see American Express II, 634 F.3d at 195-96, that such a provision would be enforceable. Accordingly, this case does not oppose the strong federal policy favoring arbitration with the rights granted in the FLSA, but instead only questions whether the right to proceed collectively may be waived.

There are good reasons to hold that a waiver of the right to proceed collectively under the FLSA is per se unenforceable--and different in kind from waivers of the right to proceed as a class under Rule 23. Collective actions under the FLSA are a unique animal. Unlike employment-discrimination class suits under Title VII or the Americans with Disabilities Act that are governed by Rule 23, Congress created a unique form of collective actions for minimum-wage and overtime pay claims brought under the FLSA.

The Fair Labor Standards Act of 1938, and its original collective action provision, was a product of the forces that gave rise to what has been termed the constitutional revolution of 1937, marking a high point in the clash of the federal courts with President Roosevelt and New Deal legislators.[11]   The original FLSA collective action provision, passed in the wake of the "switch in time that saved nine,"[12] provided that

> [a]ny employer who violates the provisions of section 6 or section 7 of this Act shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated, or such employee or employees may designate an agent or representative to maintain such action for and in behalf of all employees similarly situated. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable

---

[11]   See, e.g., Panama Refining Co. v. Ryan, 293 U.S. 388 (1935); Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555 (1935); A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935); United States v. Butler, 297 U.S. 1 (1936); Carter v. Carter Coal Co., 298 U.S. 238 (1936); Morehead v. People ex rel. Tipaldo, 298 U.S. 587 (1936).   Some scholarly work has described the close ties between Roosevelt's court packing plan and federal labor standards regulation, which was originally intended to be withheld until Congress acted on the court packing proposal. See, e.g., John S. Forsythe, Legislative History of the Fair Labor Standards Act, 6 Law & Contemp. Probs. 464, 464 (1938).

[12]   This phrase is often used to refer to the shift by Justice Owen J. Roberts in West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937), to uphold a minimum wage law in the wake of President Roosevelt's announcement of the court packing bill.

> attorney's fee to be paid by the defendant and
> costs of the action.

Fair Labor Standards Act, 75 Cong. Ch. 676, § 16(b), 52 Stat. 1060, 1069 (1938). As the Supreme Court has noted, this provision appeared for the first time in the bill reported by a Conference Committee of both Houses. See Brooklyn Sav. Bank, 324 U.S. at 705 n.15 (citing H. Rep. No. 2738, 75th Cong. 3d Sess., at 33). The bill that later became the FLSA took over thirteen months to become law and went through a variety of iterations, creating a veritable raft of legislative history. Within this, however, "[t]he only reference to Section 16(b) was by Representative Keller. . . ." Id. at 705 n.16. Representative Keller stated in relevant part:

> Among the provisions for the enforcement of the
> act an old principle has been adopted and will be
> applied to new uses. If there shall occur
> violations of either the wages or hours, the
> employees can themselves, or by designated agent
> or representatives, maintain an action in any
> court to recover the wages due them and in such a
> case the court shall allow liquidated damages in
> addition to the wages due equal to such deficient
> payment and shall also allow a reasonable
> attorney's fees and assess the court costs
> against the violator of the law so that employees
> will not suffer the burden of an expensive
> lawsuit. The provision has the further virtue of
> minimizing the cost of enforcement by the
> Government. It is both a common-sense and
> economical method of regulation. The bill has
> other penalties for violations and other judicial
> remedies, but the provision which I have
> mentioned puts directly into the hands of the

> employees who are affected by violation the means
> and ability to assert and enforce their own
> rights, thus avoiding the assumption by
> Government of the sole responsibility to enforce
> the act.

Id. (citing 83 Cong. Rec. 9264).


This collective action provision was amended by the Portal-to-Portal Act of 1947, the history of which has been described by the courts in the following manner:

> In 1947, in response to a "national emergency"
> created by a flood of suits under the FLSA aimed
> at collecting portal-to-portal pay allegedly due
> employees, Congress enacted the Portal-to-Portal
> amendments to the FLSA. 61 Stat. 87 (1947). The
> original, stated purpose of the bill containing
> these amendments was: "To define and limit the
> jurisdiction of the courts, to regulate actions
> arising under certain laws of the United States,
> and for other purposes." 93 Cong. Rec. 156 (H.R.
> 2157). To this end, the amendments, among other
> things, barred unions from bringing
> representative actions under the FLSA.

Arrington v. Nat. Broadcasting Co., Inc., 531 F.Supp. 498, 500 (D.D.C. 1982) (citations omitted); see also United Food & Commercial Workers Union, Local 1564 of N.M. v. Albertson's, Inc., 207 F.3d 1193, 1200-01 (11th Cir. 2000) (noting the Arrington court's "exhaustive survey of the legislative history of the 1947 amendments"). As amended, FLSA collective actions allow "plaintiffs the advantage of lower individual costs to

39

vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged" unlawful activity. Hoffman-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989) (describing the collective action provisions under the ADEA, which are by reference those of the FLSA).

More specifically, the revised collective action provision that resulted from these amendments limited representative suits to those workers who submit written opt-in notices. See 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought"). FLSA actions are, consequently, not true representative actions as under Rule 23, but instead those actions brought about by individual employees who affirmatively join a single suit. These collective action provisions were crafted by not one but over the course of several Congresses to balance the need to incentivize the bringing of often small claims by way of collectivization in order to ensure the statute's function, while barring actions "brought on behalf of employees who had no real involvement in, or real knowledge of, the lawsuit." Arrington, 531 F.Supp. at 501. The Act's, and more specifically this provision's, lengthy

legislative history evidences Congress' precise determination of how this balance should be struck in order to ensure the statute's remedial and deterrent functions.

In addition, as the Supreme Court has described,

[t]he legislative history of the Fair Labor Standards Act shows an intent on the part of Congress to protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce. The statute was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency as a result of the free movement of goods in interstate commerce.

Brooklyn Sav. Bank, 324 U.S. at 706-07. Although the right to sue under the FLSA is compensatory, "it is nevertheless an enforcement provision." Id. at 709. Not the least integral aspect of this remedy is the ability of employees to pool resources in order to pursue a collective action, in accordance with the specific balance struck by Congress. The particular FLSA collective action mechanism was additionally a Congressional determination regarding the allocation of enforcement costs, as the ability of employees to bring actions collectively reduces the burden borne by the public fisc, as

41

Representative Keller noted.  See 83 Cong. Rec. 9264.  Moreover, prohibition of the waiver of the right to proceed collectively accords with the Congressional policy of uniformity with regard to the application of FLSA standards, see H. Rep. No. 2182, 75th Cong., 3d Sess. at 6-7, because an employer is not permitted to gain a competitive advantage because his employees are more willing to assent to, or his human resources department more able to ascertain, collective action waivers than those of his competitors.  As the Supreme Court has noted, "the purposes of the Act require that it be applied even to those who would decline its protections."  Alamo Foundation v. Secretary of Labor, 471 U.S. 290 (1985).  It is not enough to respond that such a waiver should be upheld in the name of the broad federal policy favoring arbitration, simply because the waiver was included in an arbitration agreement.  An otherwise enforceable arbitration agreement should not become the vehicle to invalidate the particular Congressional purposes of the collective action provision and the policies on which that provision is based.[13]

---

[13]   Indeed, were employers beyond Citi to embrace these waivers, the deluge of individual wage and hour claims that would be arbitrated, notwithstanding those that would simply be forgone absent collectivization, would quite obviously run counter to the values of simplicity, expedience, and cost-saving that underlie the federal policy preference for arbitration.  See, e.g., Mitsubishi, 473 U.S. at 3354.

In sum, a waiver of the right to proceed collectively under the FLSA is unenforceable as a matter of law in accordance with the Gilmer Court's recognition that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute." Gilmer, 500 U.S. at 26.  See also Chen-Oster v. Goldman, Sachs & Co., 785 F. Supp. 2d 394 (S.D.N.Y. 2011) (holding arbitral provision waiving right to proceed as a class unenforceable as to Title VII pattern and practice claims).

*ii.  If Compelled to Arbitrate Their Claims Individually, Raniere and Bodden Would Not be Precluded from Enforcing Their Statutory Rights Due to Cost*

A party that seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive bears the burden of showing the likelihood of incurring such costs.  Green Tree, 531 U.S. at 92; American Express II, 634 F.3d at 191 (quoting Amex I, 554 F.3d at 315). Here, Plaintiffs have established that were they to be forced to arbitrate their claims individually, their costs including attorneys' and expert fees would total approximately $640,000. Specifically, Plaintiffs maintain that the attorneys' fees likely to be incurred through an individual arbitration would likely exceed $526,000 with costs in excess of $19,000. (See

Gilly Decl. ¶¶ 12-25 (Dkt. No. 48).)  Plaintiffs state that they
additionally require an institutional expert as well as an
economic damages expert (See id. at ¶¶ 20-21 (Dkt. No. 48)),
costs for which they estimate in excess of $95,300. (Id. at ¶¶
20-21, 25 (Dkt. No. 48).)  In support of this they have provided
the declaration of Mark Killingsworth, an economics professor
and Plaintiffs' economic damages expert, who estimates his fees
at $45,300.   (Killingsworth Decl. at ¶ 13 (Dkt. No. 49).)
Plaintiffs additionally note that the plaintiffs' institutional
expert in Sutherland, who was engaged to determine whether
accountants were nonexempt, estimated fees of $33,500.
Sutherland, 768 F. Supp. 2d at 551-51.


        Citi submits that these attorneys' fee estimates are
"unreasonably high" and question the need for an industry
expert. (Shaulson Decl. ¶¶ 16-20 (Dkt. No. 61).)  However,
Defendants have not submitted opposing estimates of attorneys'
fees, other than to note the estimates of the plaintiff's
counsel in another overtime exemption case recently litigated by
the defense here.  (Id. ¶ 20.)


        Plaintiffs   estimate   the   amount   of   overtime
compensation potentially owed to Bodden at approximately $28,950
using the fluctuating work week method and assuming the relevant

                            44

period is set by the FLSA's two-year limitations period for non-willful violations--plus an equal amount in liquidated damages, or roughly $57,900. (Gilly Decl. ¶ 8 (Dkt. No. 48).)[14] Plaintiffs have not submitted evidence regarding Raniere's potential damages or calculated her or Bodden's damages on a time and a half basis. Citi estimates Bodden's overtime loss at approximately $84,875 applying the fluctuating workweek method and assuming the six year statute of limitations period of, not the FLSA, but the NYLL, or $350,000 applying the time-and-a-half method over that time—-each potentially increased by liquidated damages.[15] (See Shaulson Decl. ¶¶ 11-12, Exs. I and J (Dkt. No. 61); Bridgeford Decl. ¶ 4 (Dkt. No. 59).)   Defendants assert that for Raniere, those numbers would be approximately $149,750 and $617,500, respectively, each potentially increased by liquidated damages. (See Shaulson Decl. ¶¶ 13-14, Exs. K and L (Dkt. No. 61); Bridgeford Decl. ¶ 3 (Dkt. No. 59).)


    Neither party has pointed to a case addressing the proper scope of the limitations period to apply in a case such as this, where the question presented is the practical ability of a plaintiff to bring a federal claim (with a shorter statute

---

[14]    Plaintiffs' briefing provides after tax estimates, though they cite no authority and make no argument in support of this approach.  Pre-tax figures are provided here.
[15]    The parties' estimates are roughly equal under a two year statute of limitations based on a fluctuating work week method.

of limitations), where she has also alleged a parallel state claim (with a longer limitations period).  The Court of Appeals in American Express emphasized that the nature of its inquiry under the statutory rights analysis was the "practical effect" of the enforcement of such a waiver.  634 F.3d at 196.  With this in mind, this Court is of the view that where state claims might act, in a practical sense, to bootstrap otherwise smaller federal claims, such that the latter could be vindicated in the arbitral forum, the longer state limitations period should be considered in assessing whether a plaintiff has met her burden under American Express.  Use of the six year New York statute of limitations period is therefore appropriate.

Accordingly, Bodden's potential recovery can be estimated at approximately $84,875 applying the fluctuating workweek method or $350,000 applying the time and-a-half method, and Raniere's potential recovery can be estimated at approximately $149,750 or $617,500, each potentially doubled during the federal statutory period and increased by either 25% or 100% for the state limitations period.[16]

---

[16]    Effective April 9, 2011, New York amended its Labor Law, which previously provided for 25% liquidated damages, to provide 100% in liquidated damages.  Compare N.Y. Lab. Law § 663 (McKinney 2010) with N.Y. Lab. Law § 663 (McKinney 2011).  Courts are split as to whether this liquidated damages clause should be given retroactive effect.  Compare Wicaksono v. XYZ 48 Corp., No. 10 Civ. 3635, 2011 WL 2022644 (S.D.N.Y. May 2, 2011) (refusing to give NYLL's liquidated damages provisions retroactive effect) with Ji v.

Plaintiffs argue that the reasoning in Sutherland, 768 F. Supp. 2d 547, is apposite here.   In that case, likewise involving alleged nonpayment of overtime wages, the Court found that the plaintiff had "substantially demonstrated that an inability to prosecute her claims on a class basis would be tantamount to an inability to assert her claims at all."   Id. at 553 (citation and internal quotation marks omitted).   Because the plaintiff could only expect to recover roughly $1,900 plus an equal amount of liquidated damages (approximately $3,800), for which she would need to shoulder a burden of upwards of $200,000, Judge Wood held that the class waiver was unenforceable. Id. at 551-54.   Additionally, the arbitration agreement in Sutherland placed "obstacles to reimbursement of fees and expenses." Id. at 553.   This included leaving to the discretion of the arbitrators both "[w]hether attorney's fees and expenses incurred during arbitration are compensable" as well as the "amount of such reimbursement," in contrast to the FLSA's mandatory fee shifting provision. Id. (emphasis in original) (citing 29 U.S.C. § 216(b)).

---

Belle World Beauty, Inc., No. 603228/2008 (N.Y. Sup. Ct. Aug. 22, 2011) (giving the provision retroactive effect).

Under the FLSA, a plaintiff who prevails on her claims is entitled to "a reasonable attorney's fee to be paid by the defendant and the costs of the action." 29 U.S.C. §216(b). Unlike in Sutherland, the 2011 Arbitration Policy provides that "[t]he arbitrator(s) shall be governed by applicable federal, state, and/or local law" and expressly provides arbitrators with the authority to award attorneys' fees "where expressly provided by applicable law." (See Byers Decl., ¶ 3, Ex. 1A at 51 (Dkt. No. 28).) While the Policy enacts a default that each side shall pay its own legal fees and expenses, it does so "[u]nless otherwise precluded by applicable law." (See Byers Decl., ¶ 3, Ex. 1A at 51-52 (Dkt. No. 28).) As fee shifting is mandatory under the FLSA, 29 U.S.C. § 216(b), the default is therefore precluded. See, e.g., Carter, 362 F. 3d at 299 (arbitrator required to award plaintiffs attorney's fees and costs under the FLSA where arbitrator could, "in his or her discretion, permit the prevailing party to recover fees and costs only to the extent permitted by applicable law.").

Fee shifting alone is not per se sufficient to render a class action waiver enforceable. The Court of Appeals expressly noted in American Express that that case involved an arbitration agreement under which not only were attorneys' fees recoverable, but also treble damages, but that Court nonetheless

48

refused to compel arbitration.  American Express II, 634 F.3d at 198.  Therefore, that the arbitration agreement here provides for the same mandatory shifting of attorneys' fees as in a judicial forum is not in itself sufficient to ensure that plaintiffs are not practically precluded from pursing their statutory rights.[17]

While the Court agrees with and fully adopts the reasoning of Sutherland, no such practical obstacles exist to individual recovery by Bodden or Raniere here.  Each of their potential individual recoveries is many times larger than the plaintiff in Sutherland, and large enough that it would be neither lunacy nor fanaticism for either plaintiff, or her counsel, to pursue her claim individually.[18]  This is in consideration of each plaintiff's right to "to include the risk of losing, and thereby not recovering any fees" in evaluating the potential costs of her suit, American Express I at 554 F.3d at 318, and as well as the fact that the arbitral agreement here provides for mandatory shifting of attorney's fees.[19]

---

[17]     Defendants additionally rely on Pomposi, 2010 WL 147196, and D'Antuono v. Service Road Corp., 789 F.Supp.2d 308 (D.Conn. 2011).  However, neither case meaningfully discussed a plaintiff's ability to retain counsel when the total fees and costs was many times the potential recovery.
[18]     Plaintiffs' counsel's unwillingness to do so is beside the point.  (See Gilly Decl. ¶ 27, (Dkt. 48).)
[19]     Plaintiffs' counsel has stated that he would be unwilling to take these cases on an individual basis. (See Gilly Decl. ¶ 27 (Dkt. 48).)

In sum, having examined the totality of the facts and circumstances, the Court finds that the collective waiver provision at issue here is not unenforceable on the basis that costs would prevent Raniere or Bodden from vindicating their statutory rights in individual arbitration. See American Express II, 634 F.3d at 196.

*iii. Practical Effect*

Deciding the enforceability of this collective action waiver on the basis of quite clear Congressional action seems, in this instance, to be preferable to projecting hypothetical and hotly contested costs. This decision is fortified by American Express II, which must be read to require that if any one potential class member meets the burden of proving that his costs preclude him from effectively vindicating his statutory rights in arbitration, the clause is unenforceable as to that class or collective.[20] See American Express II, 634 F.3d at 194. Any other reading would lead district courts down the rabbit

---

[20]    In this regard, Plaintiffs have provided declarations estimating that Lori Lesser would have no after tax recovery using a two year statute of limitations and would have only a $1,161 recovery after taxes assuming a three year statute of limitations and using the fluctuating workweek method. Plaintiffs estimate that David Hind would have no after tax recovery using a two year statute of limitations and a $4,637 recovery using a three year statute of limitations and the fluctuating workweek method. Plaintiffs provide no pre-tax estimates for either Lesser or Hind. (Gilly Decl. ¶ 10 (Dkt. No. 48).)

hole of piecemeal litigation, confounding the twin advantages of reducing judicial caseload as well as costs to litigants.

Although the collective action waiver provision is unenforceable and therefore must be severed, see Chen-Oster, 785 F.Supp.2d at 410-11; Herrera, 532 F.Supp.2d at 647; Beletsis v. Credit Suisse First Boston, Corp., No. 01 Civ. 6266, 2002 WL 2031610, at *6 (S.D.N.Y. Sept. 4, 2002), the Court cannot order class arbitration of the instant claims.  The 2011 Arbitration Policy expressly provides that "[i]n the event this waiver is found to be unenforceable, then any claim brought on a class, collective, or representative action basis must be filed in a court of competence jurisdiction, and such court shall be the exclusive forum for such claims." (Gross Decl. 49 (Dkt. No. 60).)  Accordingly, the Court must deny Defendants' motion to compel arbitration in its entirety and therefore declines to dismiss or stay any court proceedings.

Regardless of this determination, this collective action will proceed, as even without Raniere and Bodden, one named plaintiff as well as eight opt-ins remain.

51

**III. Plaintiffs' Motion for Conditional Collective Certification and Related Relief is Granted**

Plaintiffs seek conditional certification of the collective group of persons employed by Defendants "as Home Lending Specialists, Loan Consultants and/or any other similar positions who were not paid overtime compensation for all hours worked in excess of 40 hours per week" from three years prior to the filing of this law suit on April 8, 2011 to the present. (Gilly Aff. Ex. B (Dkt. No. 18).)   Plaintiffs have proposed a Notice of Pendency and Plaintiff Consent Form. (See Gilly Aff., Ex. B (Dkt. No. 18).).   Plaintiffs additionally seek expedited disclosure of "the names, addresses, home and mobile telephone numbers, email addresses, and dates of employment of all Home Lending Specialists, Loan Consultants, and any similar mortgage lending position employed from a date three years prior to the filing of this action for such employees who worked outside of New York State and from a date six years prior to the filing of this action for such employees who worked in New York state." (Pls. Cert. Mem. 18.)

**A.   The Standard for Conditional Certification for FLSA Collectives**

The FLSA requires employers to pay their employees overtime wages, at the rate of time and a half, for hours in excess of 40 hours worked in a single week if the employees are not "exempt" under several recognized categories. 29 U.S.C. § 207. The FLSA exempts from overtime requirements persons who are employed in an administrative or executive capacity, employed as outside salespersons, if they are highly compensated, a combination of the foregoing or, in certain circumstances, when they are employed in retail services. See 29 U.S.C. § 213(a)(1) (administrative, executive, outside sales, and retail services exemptions); 29 C.F.R. § 546.601(a) (highly compensated employee exemption); 29 C.F.R. § 541.708 (combination exemption). These exemptions are narrowly construed and the burden rests on the employer to show that the employees are properly classified as exempt. See Martin v. Malcolm Pimie, Inc., 949 F.2d 611, 614 (2d Cir. 1991).

Plaintiffs' federal claims are brought pursuant to Section 216(b) of the FLSA. As earlier discussed, this section provides for a private right of action to recover unpaid overtime compensation and liquidated damages from employers who violate the Act's overtime provisions. See 29 U.S.C. § 216(b).

53

With regard to collective actions, the FLSA states, in relevant part that:

> An action . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by anyone or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b).

Courts in this Circuit utilize a two-step process for determining whether to proceed collectively under Section 216(b). See, e.g., Myers v. Hertz Corp., 624 F.3d 537, 554 (2d Cir. 2010). In the first stage, the court must make an initial determination as to whether the named plaintiffs are "similarly situated" to the putative collective members. Id.; see also Cunningham v. Elec. Data Systems Corp., 754 F. Supp. 2d 638, 644 (S.D.N.Y. 2010) (quoting Lynch v. United Services Auto. Ass'n, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007)); Morales v. Plantworks, Inc., No. 05 Civ. 2349 (DC), 2006 WL 278154, at *1-2 (S.D.N.Y. Feb. 2, 2006). If the named plaintiffs make what has been described as a "'modest factual showing'" that they and potential opt-in plaintiffs "'together were victims of a common

54

policy or plan that violated the law,'" court facilitated notice is appropriate. Myers, 624 F.3d at 555 (quoting Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997)); see also Cunningham, 754 F. Supp. 2d at 644; Lynch, 491 F. Supp. 2d at 368. For this reason, the initial phase is often termed the "notice stage." See Lynch, 491 F. Supp. 2d at 368.

Because certification at this first early stage is preliminary and subject to reevaluation, the burden for demonstrating that potential plaintiffs are "similarly situated" is very low. See Lynch, 491 F. Supp. 2d at 368; Spicer v. Pier Sixty LLC, 269 F.R.D. 321, 336 (S.D.N.Y. 2010) ("The first stage, conditional certification, requires only a modest factual showing based on the pleadings and affidavits that the putative class members were victims of a common policy or plan that violated the law.") (internal citations and quotation marks omitted). "'The leniency of this requirement is consistent with the broad remedial purpose of the FLSA.'" Spicer, 269 F.R.D. at 336 (quoting Morales, 2006 WL 278154 at *2).[21]

---

[21]    This fairly lenient standard is "'considerably less stringent'" than the requirements for class certification under Rule 23. Vaughan v. Mortgage Source LLC, No. 08 Cir. 4737 (LDW)(AKT), 2010 WL 1528521, at *4 (E.D.N.Y. Apr. 14, 2010) (quoting Rodolico v. Unisys Corp., 199 F.R.D. 468, 481 (E.D.N.Y. 2001)); see also Malloy v. Richard Fleischman & Assocs. Inc., 09 Civ. 322 (CM), 2009 WL 1585979, *2 (S.D.N.Y. June 3, 2009).

At this initial step, Plaintiffs need only provide "some factual basis from which the court can determine if similarly situated potential plaintiffs exist." Morales, 2006 WL 278154 at *2 (quoting Jackson v. New York Tel. Co., 163 F.R.D. 429, 431 (S.D.N.Y. 1995) (internal quotation marks omitted). "Plaintiffs may satisfy this requirement by relying on their own pleadings, affidavits, declarations, or the affidavits and declarations of other potential class members." Hallissey v. Am. Online, Inc., 99 Civ. 3785 (KTD), 2008 WL 465112, at *1 (S.D.N.Y. 2008) (citing Anglada v. Linens 'N Things, Inc., 2007 WL 1552511 at *4 (S.D.N.Y. Apr. 26, 2007)). In some cases, "it may be appropriate . . . to find plaintiffs and potential plaintiffs similarly situated based simply on plaintiffs' substantial allegations that they and potential plaintiffs were common victims of a FLSA violation, particularly where defendants have admitted that the actions challenged by plaintiffs reflect a company-wide policy." Damassia v. Duane Reade, Inc., 04 Civ. 8819 (GEL), 2006 WL 2853971, *3 (S.D.N.Y. Oct. 5, 2006) (internal quotation marks and citations omitted); accord Davis v. Abercrombie & Fitch Co., 2008 WL 4702840, at *9 (S.D.N.Y. Oct. 23, 2008) *476 ("similarly situated" standard "may be satisfied with 'substantial allegations' of a factual nexus between named plaintiffs and potential opt-in plaintiffs with regard to their employer's alleged FLSA violation")

(quoting <u>Ayers v. SGS Control Servs., Inc.</u>, 2004 WL 2978296, at
\*5 (S.D.N.Y. Dec. 21, 2004)) (additional citation omitted).   At
this stage, the "court need not evaluate the underlying merits
of a plaintiff's claims to determine whether the plaintiff has
made the minimal showing necessary for court-authorized notice."
<u>Damassia</u>, 2006 WL 2853971, \*3 (citing <u>Scholtisek v. Eldre Corp.</u>,
229 F.R.D. 381, 391 (W.D.N.Y. 2005); <u>Gjurovich v. Emmanuel's</u>
<u>Marketplace, Inc.</u>, 282 F. Supp. 2d 101, 105 (S.D.N.Y. 2003);
<u>Sbarro</u>, 982 F.Supp. at 262).


         However, certification is not automatic. "While the
factual showing that [the putative representative] must make at
this stage is 'modest,' it must be 'sufficient to demonstrate
that [he] and potential plaintiffs together were victims of a
common policy or plan that violated the law.'" <u>Levinson v.</u>
<u>Primedia Inc.</u>, 02 Civ. 2222 (CBM), 2003 WL 22533428, \*1
(S.D.N.Y. Nov. 6, 2003) (quoting <u>Sbarro</u>, 982 F. Supp. 249 at
261). "The modest factual showing cannot be satisfied simply by
unsupported assertions, but it should remain a low standard of
proof because the purpose of this first stage is merely to
determine <u>whether</u> 'similarly situated' plaintiffs do in fact
exist." <u>Myers</u>, 624 F.3d at 555 (emphasis in original, citations
and quotation marks omitted).   "Conclusory allegations" are not

enough to satisfy this burden.  See Morales, 2006 WL 278154, at *2-3 (internal quotation and citation omitted).

At the second stage, following discovery, the defendant may move to decertify the collective if discovery shows that the individuals who opt-in are not in fact similarly situated to the named plaintiff(s).  Myers, 624 F.3d at 555. "The action may be 'decertified' if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice." Id.  This second stage inquiry is more stringent because the court "is able to examine whether the actual plaintiffs brought into the case are similarly situated." Gortat v. Capala Brothers, Inc., 07 Civ. 3629 (ILG), 2010 WL 1423018, at *10 (E.D.N.Y. Apr. 9, 2010) (emphasis in original). "Because courts retain the ability to reevaluate whether the plaintiffs are similarly situated at the second stage, the first-stage determination is merely 'preliminary' and subject to reversal, explaining why the plaintiff's first-stage burden is low." Cunningham, 754 F. Supp. 2d at 645 (citing Lynch, 491 F.Supp.2d at 368 and Lee v. ABC Carpet & Home, 236 F.R.D. 193, 197 (S.D.N.Y. 2006)).

**B.  Plaintiffs Have Made a Sufficient Showing that They and Potential Opt-in Plaintiffs are Similarly Situated**

In the instant case, Plaintiffs have all alleged that they and the potential opt-in plaintiffs, who also worked as loan consultants, home lending specialists, or similarly titled positions at Citi offices, were subject to a national policy of working more than 40 hours per week without receiving overtime in violation of the FLSA.  Specifically, Plaintiffs allege they "worked substantially in excess of 40 hours per week, frequently working between 50 and 70 hours per week" and that until on or about September 1, 2010, Plaintiffs were not paid overtime compensation for hours worked in excess of 40 hours per week and that before that time Defendants did not keep time records for loan consultants.  (Compl. ¶ 36-38; Raniere Decl. ¶¶ 10-12 (Dkt. No. 20); Bodden Dec. ¶¶ 10-12 (Dkt. No. 19); Vosburgh Decl. ¶¶ 10-12 (Dkt. No. 21).)   This allegation is supported by the affidavits of opt-in plaintiffs Singer, Hind, and Lesser. (Singer Decl. ¶¶ 10-12 (Dkt. No. 24); Hind Decl. ¶¶ 10-12 (Dkt. No. 22); Lesser Decl. ¶¶ 10-12 (Dkt. No. 23).)   Plaintiffs' allege, and affidavits of three opt-in plaintiffs support, that their primary duty was to complete mortgage applications for customers interested in purchasing a home mortgage and that their duties in so doing were substantially similar. (See Compl. at ¶¶ 25-34; Raniere Decl. ¶¶ 3-9 (Dkt. No. 20); Bodden Dec. ¶¶ 3-9 (Dkt. No. 19); Vosburgh Decl. ¶¶ 3-9 (Dkt. No. 21); Singer Decl. ¶¶ 3-9 (Dkt. No. 24); Hind Decl. ¶¶ 3-9 (Dkt. No. 22);

Lesser Decl. ¶¶ 3-9 (Dkt No. 23).)   Plaintiffs also attest that
they "frequently interacted with many other Loan Consultants"
and are "aware that other Loan Consultants performed the same
job duties as me and at all times have been treated similarly to
me by Citi with respect to hours worked and compensation
policies and practices," and that they are aware that other Loan
Consultants were not paid overtime. (See Compl. at ¶¶ 4, 45-47;
Raniere Decl. ¶¶ 5, 12-13, 15 (Dkt. No. 20); Bodden Dec. ¶¶ 5,
12-13, 15 (Dkt. No. 19); Vosburgh Decl. ¶¶ 5, 12-13 (Dkt. No.
21); Singer Decl. ¶¶ 5, 12-13, 15 (Dkt. No. 24); Hind Decl. ¶¶
5, 12 (Dkt. No. 22); Lesser Decl. ¶¶ 5, 12 (Dkt No. 23).)   This
is likewise supported by Plaintiffs' assertions, discussed
below, regarding the regular conference calls that Citi
organized for its Loan Consultants nationally, as well as
memoranda it sent to Loan Consultants nationally.

Plaintiffs' further assert that while their formal job
titles changed from time to time during their employment, their
primary duties did not change. (See Raniere Aff. at ¶ 2 (Dkt.
No. 20), Bodden Aff. at ¶ 2 (Dkt. No. 19); Vosburgh Aff. at ¶ 2
(Dkt. No. 21).)   The affidavits of three opt-in plaintiffs
support this point. (See Singer Aff. at ¶ 2 (Dkt. No. 24); Hind
Decl. ¶ 2 (Dkt. No. 22); Lesser Decl. ¶ 2 (Dkt. No. 23).)
Plaintiffs further provide a memorandum sent on April 30, 2009,

by Jeff Arestivo, the Citi National Mortgage Director, to all Home Lending Specialists nationwide, notifying them that their title was changed from "Loan Consultant" to "Home Lending Specialist." (See Raniere Decl. ¶ 2, Ex. 1 (Dkt. No. 20); Bodden Decl. ¶ 2, Ex. 1 (Dkt. No. 19); Singer Decl. ¶ 2, Ex. 1 (Dkt. No. 24).) Plaintiffs allege that this memorandum, which also notified Home Lending Specialists of national conference calls addressing compensation and mortgage processing and operations topics, is similar to many nationwide communications Citi sent to Loan Consultants nationally and that participants on these calls included Loan Consultants from New York, New Jersey, Connecticut, Maryland, Florida, California, Texas, Missouri, Chicago, Illinois, Michigan, and Nevada. (See Raniere Decl. ¶ 13 (Dkt. No. 20); Bodden Decl. ¶ 13 (Dkt. No. 19); Vosburgh Decl. ¶¶ 13, 14 (Dkt. No. 21); Singer Decl. ¶ 13 (Dkt. No. 24); Hind Decl. ¶¶ 13, 14 (Dkt. No. 22); Lesser Decl. ¶¶ 13, 14 (Dkt. No. 23).)

Plaintiffs' declarations state that on or about July 1, 2010, during a nationwide conference call, Desmond Smith, the Citi National Mortgage Sales Director, informed all Home Lending Specialists that their position "was now considered non-exempt" and that they would begin receiving overtime compensation going forward. (See Raniere Decl. ¶¶ 13-16 (Dkt. No. 20); Bodden

61

Decl. ¶¶ 13-16 (Dkt. No. 19); Singer Decl. ¶¶ 13-16 (Dkt. No. 24).) According to Plaintiffs, on this same nationwide conference call, Plaintiffs and all other Home Lending Specialists were notified that they would be required to begin recording their hours on Citi's internal time keeping software. (See Raniere Decl. ¶¶ 13-16 (Dkt. No. 20); Bodden Decl. ¶¶ 13-16 (Dkt. No. 19); Singer Decl. ¶¶ 13-16 (Dkt. No. 24).) According to Plaintiffs, Defendants have employed, and currently employ hundreds of Home Lending Specialists, Loan Consultants, and other similarly titled positions whose primary duties were the origination of home mortgages. (See Compl. ¶ 51; Raniere Decl. ¶¶ 13, 17 (Dkt. No. 20); Bodden Decl. ¶¶ 13, 17 (Dkt. No. 19); Vosburgh Decl. ¶¶ 13, 15 (Dkt. No. 21); Singer Decl. ¶¶ 13, 17 (Dkt. No. 24); Hind Decl. ¶¶ 13, 15 (Dkt. No. 22); Lesser Decl. ¶¶ 13, 15 (Dkt. No. 23).)

Plaintiffs contend that Defendants' nationwide reclassification of potential members of the putative collective, in particular, constitutes evidence of a company-wide policy or plan. While this fact alone is insufficient to justify conditional certification, the evidence to this effect does lend support to conditional certification in so far as it supports that Defendants treated Plaintiffs and potential opt-in plaintiffs with uniform pay and employment-related policies. In

this regard, Defendants are incorrect that courts in this Circuit and elsewhere regularly deny FLSA certification in misclassification cases. (See Defs. Cert. Opp'n Mem. 11.) See Lynch, 491 F. Supp. 2d at 370 (S.D.N.Y. 2007) (finding notice to be typically appropriate "upon a simple showing that other employees may also have been subjected to the employers' practice of 'misclassifying.'"); Patton v. Thompson Corp., 364 F. Supp. 2d 263, 267 (E.D.N.Y. 2005); ABC Carpet, 236 F.R.D. at 197. Specifically, Defendants' reliance on Diaz v. Elec. Boutique of Am., Inc., 04 Civ. 0840 (E) (SR), 2005 WL 2654270, at *4 (W.D.N.Y Oct. 17, 2005) for that point is unfounded. See Francis v. A & E Stores, Inc., 06 Civ. 1638 (CS) (GAY), 2008 WL 4619858, *3 n.3 (S.D.N.Y. Oct. 16, 2008) (noting that Diaz is "against the weight of authority").


Second, even under the more stringent Rule 23 class certification standard, consideration of a blanket exemption policy is appropriate, though not dispositive. See Myers, 624 F.3d at 549 ("With respect . . . Hertz's blanket exemption policy, we agree with the Ninth Circuit that while such a policy suggests 'the employer believes some degree of homogeneity exists among the employees,' and is thus in a general way relevant to the inquiry here, the existence of a blanket exemption policy, standing alone, is not itself determinative of

'the main concern in the predominance inquiry: the balance between individual and common issues.'") (quoting In re Wells Fargo Mortgage Overtime Pay Litig., 571 F.3d 953, 957, 959 (9th Cir. 2009)); Damassia v. Duane Reade, Inc., 250 F.R.D. 152, 159-60 (noting common exemption policy's relevance but examining evidence regarding the actual duties of plaintiffs to find predominance under Rule 23). Indeed, even at the summary judgment stage or at trial, courts have on occasion considered reclassification of FLSA exemption status as evidence of culpable conduct. See Wallace v. Countrywide Home Loans, Inc., 08 Civ. 1463, 2009 WL 4349534, at *5 (C.D. Cal. Nov. 23, 2009) (denying summary judgment upon finding that genuine issue of fact remains as to whether reclassification was an admission that wages were owed or were instead a resolution to a dispute); Rubery v. Buth-Na-Bodhaige, Inc., 470 F. Supp. 2d 273, 280 n.6 (W.D.N.Y. 2007) (denying summary judgment, noting that "[t]here also appears to be a factual dispute regarding the defendant's decision to change [plaintiff's] status to non-exempt"); Sav-on Drug Stores, Inc. v. Super. Ct. of L.A. Cty., 96 P.3d 194, 202 n.4 (Cal. 2004) (noting that the trial court "could rationally have regarded the reclassification as common evidence respecting both defendant's classification policies and the [employee's] actual status during the relevant period").

More fundamentally, the fact-intensive inquiry advocated by Defendants is inconsistent with the standard for conditional certification. Defendants contend that "[t]he very issue underlying Plaintiffs' Notice Motion here – that Citi failed to pay LCs overtime by treating them as exempt employees - requires a fact-specific inquiry to assess each [home lending consultant/specialist]'s qualification for various exemptions." (See Def. Cert. Opp'n Mem. 2, 16-24.)   The issue here is not whether Plaintiffs and other Loan Consultants were identical in all respects, but "rather whether they were subjected to a common policy to deprive them of overtime pay when they worked more than 40 hours per week." Vaughan, 2010 WL 1528521, at *7. A person-by-person fact-intensive inquiry is premature at the conditional certification stage and has been specifically rejected by courts within this Circuit. See Cohen v. Gerson Lehrman Group, Inc., 686 F. Supp. 2d 317, 326 (S.D.N.Y. 2010) ("[a]t [the conditional certification] phase, the court does not resolve factual disputes, decide ultimate issues on the merits, or make credibility determinations"); Neary v. Metro. Prop. & Cas. Ins. Co., 517 F. Supp. 2d 606, 621-22 (D. Conn. 2007) (rejecting "[d]efendant's argument that in determining whether its claim of applicability of the administrative exemption is valid, individualized inquiry is necessary").   It is well-established that the merits of Plaintiff's claims need not be

65

resolved at this early stage. Lynch, 491 F. Supp. 2d at 368 ("a court should not weigh the merits of the underlying claims in determining whether potential opt-in plaintiffs may be similarly situated"); Chowdhury v. Duane Reade, Inc., No. 06 Civ. 2295 (GEL), 2007 WL 2873929, *2 (S.D.N.Y. 2007) (citations omitted); Damassia, 2006 WL 2853971, at *2; Scholtisek, 229 F.R.D. at 391; Gjurovich, 282 F. Supp. 2d at 105; Sbarro, 982 F. Supp. At 262; cf. Cunningham, 754 F. Supp. 2d 638 (refusing to apply more stringent second stage evaluation because some discovery had been conducted). Only after discovery do courts engage in the more stringent inquiry, whether the opt-in plaintiffs are in fact similarly situated. See Chowdhury, 2007 WL 2873929, at *3; Damassia, 2006 WL 2853971, at *3; Neary, 517 F. Supp. 2d at 620. As earlier noted, Defendants' reliance on Diaz to the contrary is unavailing. See Francis, 2008 WL 4619858, *3 n.3 (noting that Diaz, 2005 WL 2654270, and other cases "denying conditional certification where fact-specific inquiry might be required, seem to be against the weight of authority in undertaking that analysis at the first stage of the certification process, rather than evaluating at the decertification stage whether the need for individual analysis makes a collective action inappropriate.").

Indeed, conditional certification has been granted in cases involving mortgage loan officers where similar or less evidence of a factual nexus between members of the proposed class was presented. See Vaughan, 2010 WL 1528521 at *1 (granting conditional certification of collective action of loan officers); Bifulco v. Mortgage Zone, Inc., 262 F.R.D. 209, 217 (E.D.N.Y. 2009) (same); Thompson v. World Alliance Fin. Corp., 08 Civ. 4951 (AKT), 2010 WL 3394188, *6 (E.D.N.Y. Aug. 20, 2010) (same); Searson v. Concord Mortg. Corp., 07 Civ. 3909 (DRH) (ARL), 2009 WL 3063316 at *1 (E.D.N.Y. Sept. 24, 2009) (same); Sexton v. Franklin First Fin., Ltd., 08 Civ. 04950 (JFB) (ARL), 2009 WL 1706535 at *1 (E.D.N.Y. June 16, 2009) (same); see also Shabazz v. Morgan Funding Corp., 269 F.R.D. 245, 251 (S.D.N.Y. 2010) (denying motion to decertify collective action of loan officers).

Defendants additionally assert that the purported collective members are not similarly situated because they may be subjected to different arbitration agreements. On a motion for conditional certification, the inquiry is whether Plaintiffs have made a "modest factual showing" that they and potential opt-in plaintiffs "were victims of a common policy that violated the law." Myers, 624 F.3d at 555. While Defendants assert that whether the particular arbitration agreements at issue are

enforceable "present unique defenses unsuitable for collective action treatment," they conflate the standard for certification under Rule 23 with that for FLSA conditional certification. (See Def. Cert. Opp'n Mem. at 17.)   Indeed, each of the cases cited by Defendants in support of this argument involved class certification pursuant to Rule 23 which involves a different-- and more stringent--analysis than that applicable here. See Clausnitzer v. Fed. Exp. Corp., 248 F.R.D. 647, 655-56 (S.D. Fla. 2008); and Spann v. AOL Time Warner, Inc., 219 F.R.D. 307, 316-20 (S.D.N.Y. 2003); In re Independent Energy Holding PLC Sec. Litig., 00 Civ. 6689 (SAS), 2002 WL 1059086, at *4 (S.D.N.Y. May 28, 2002); Beck v. Status Game Corp., 89 Civ. 2923 (DNE), 1995 WL 422067, at *4 (S.D.N.Y. July 14, 1995). Defendants have failed to cite a single authority finding that due to the possibility that members of the collective might be compelled to bring their claims in an arbitral forum, certification is not appropriate.   Such arguments are best suited to the second certification stage, where, on a fuller record, the court will examine whether the plaintiffs and opt- ins are in fact similarly situated. See Myers, 624 F.3d at 555

In addition, Defendants have submitted eleven declarations from current employees in attempts to demonstrate the diversity of job functions among the purported collective

members. (See Dkt. No. 34-44.). However, as the court found in Ruggles v. Wellpoint, Inc., 591 F. Supp. 2d 150, 160 (N.D.N.Y. 2008), "[n]otwithstanding [Defendant's] opposition to Plaintiffs' [a]ffidavits with sixty-six (66) of its own in an attempt to show that the employees were not similarly situated and challenge Plaintiffs' ability to show any common policy or plan, such opposition would not defeat Plaintiffs, at this first step, if they have met their initial burden." To balance the parties' competing affidavits at this stage would require the Court to determine the facts, determine credibility of the affiants, and resolve legal contentions, all of which the conditional certification and potential later decertification process is structured so as to avoid. As long as Plaintiffs' Affidavits are sufficiently similar and detailed to constitute a preliminary showing that they and other potential plaintiffs together were victims of a common policy or plan, Plaintiffs have met their burden. Id. at 160-61 (citations omitted); see also Cohen, 686 F. Supp. 2d at 330 (S.D.N.Y. 2010) (declining to "wade into a thicket of competing factual assertions at this preliminary stage" because "'[t]o hold to the contrary would preclude certification of a collective action in any FLSA case where the defendant was asserting an administrative exemption defense.'") (quoting Neary, 517 F. Supp. 2d at 621-22); Francis v. A & E Stores, Inc., 06 Civ. 1638 (CS) (GAY), 2008 WL 4619858

at *3 (S.D.N.Y. Oct. 16, 2008) ("while Defendant has supplied what it calls 'undisputed store manager affidavits,' on which it also relies for the proposition that ASM duties are variable, those affidavits should be discounted at this stage."); Davis, 2008 WL 4702840 at *7 ("Defendants cite the declaration of plaintiffs' supervisor attesting that such a practice was never allowed to occur. This, of course, is of the same evidentiary value as plaintiffs' affirmations to the contrary. This is a factual dispute which the Court cannot resolve at this stage and on this limited record.") (citation omitted).

The cases relied on by Defendants in opposition to preliminary certification are either inapposite or unpersuasive. Many are inapplicable because they involve certification of a Rule 23 class using a different, and substantially more stringent, analysis. See, e.g., Vinole v. Countrywide Home Loans, Inc., 571 F. 3d 935, 938 (9th Cir. 2009); Wells Fargo, 571 F. 3d at 958-59; Bachrach v. Chase Inv. Services Corp., 06 Civ. 2785 (WJM), 2007 WL 3244186 at *1 (D. N.J. Nov. 1, 2007). Others involved analysis under the more fact intensive scrutiny of the second, later decertification stage. See, e.g., Oetinger v. First Residential Mortg. Network, Inc., 06 Civ. 381 (H), 2009 WL 2162963 at *2 (W.D. Ky. July 16, 2009); Wong v. HSBC Mortg.

Corp. (USA), 07 Civ. 2446 (MMC), 2010 WL 3833952 at *2 (N.D.
Cal. Sept. 29, 2010).

        Finally, Defendants cite a number of cases in which
the plaintiffs failed to provide evidence to support a finding
of an unlawful common policy or plan, which is not the case
here. See, e.g., Trinh v. JP Morgan Chase & Co., 07 Civ. 1666
(W)(WMC), 2008 WL 1860161, at *3-4 (S.D. Cal. Apr. 22, 2008)
(FLSA collective action by two loan officers employed for less
than six months in the same office, where they "simply state[d]
that [they] and the members of the putative class had
essentially the same job description and training and were
compensated in the same manner" and "provide[d] no real
evidence, beyond their own speculation, suggesting that loan
officers across the country . . . receive the same compensation
and are required to work in the same manner"); Armstrong v.
Weichert Realtors, 05 Civ. 3120 (JAG), 2006 WL 1455781 at *1 (D.
N.J. May 19, 2006) (insufficient showing where "[p]laintiff
offered the one-page declaration of William Armstrong as the
sole piece of evidence in support of the motion for class
certification").

        In sum, by way of the pleadings, affidavits, and
exhibits, Plaintiffs have made more than the necessary "modest

                                71

showing" of a nexus between their situation and that of potential opt-in plaintiffs for conditional certification of a collective action pursuant to Section 216(b) of the FLSA.

## C.  Collective Definition

Plaintiffs' have defined the proposed collective as, all current and former employees of Defendants who worked "as Home Lending Specialists, Loan Consultants and/or any other similar positions who were not paid overtime compensation for all hours worked in excess of 40 hours per week" from three years prior to the filing of this law suit on April 8, 2011 to the present. (Gilly Aff. Ex. B (Dkt. No. 18).)[22]  Defendants argue that this class definition fails because it requires individual inquiry as to the primary duties of Defendants' employees and constitutes a fail-safe. As noted above, individual inquiry of the type proposed by Defendants is

---

[22]  Plaintiffs have also put forward the following definition:

> [T]he collective group of persons employed by Defendants Citigroup Inc., Citibank, N.A., and/or CitiMortgage Inc. (together "Defendants" or "Citi"), as "Home Lending Specialists," "Loan Consultants," and any and all other similarly situated positions engaged in the primary duty of assisting customers with home mortgage and/or re-finance applications, who were not paid overtime compensation in violation of the Fair Labor Standards Act (the "FLSA Collective") for the period of three years prior to the filing of this Complaint to the date of the final disposition of this action ("the FLSA Collective Period").

(Pls. Cert. Mem. 1.)  As the definition included in the Plaintiffs' proposed notice is narrower, and the Court finds more suitable, that definition is addressed here.

inappropriate at this stage.   Second, Defendants argue that Plaintiffs' proposed collective definition amounts to a legal fail-safe of "anyone who was wronged by Citi." (Def. Cert. Opp'n Mem. at 12.)   The proposed definition specifies the categories of employees entitled to notice based on current and/or former job titles. See e.g. Bifulco, 262 F.R.D. at 215 (conditionally certifying collective of "all similarly situated persons employed by [d]efendants, who are or were employed as loan officers or other similarly titled positions"); Thompson, 2010 WL 3394188 at *7-8 (conditionally certifying collective of "all similarly situated persons employed by Defendant as loan officers or other similarly titled positions").   Plaintiffs' definition is a far cry from the unworkable class definitions in the cases cited by Defendants.   See, e.g., Adashunas v. Negley, 626 F.2d 600, 601, 603 (7th Cir. 1980) (rejecting Rule 23 class definition of "all children within the State of Indiana entitled to public education who have learning disabilities and who are not properly identified and/or not receiving special instruction as to guarantee minimally adequate education" because "[h]ow does one identify class members consisting of persons not identified?"); Randleman v. Fidelity Nat'l Title Ins., 09 Civ. 4533, 2011 WL 1833198 at *4 (6th Cir. May 16, 2011) (Rule 23 class definition improper because it was tantamount to those who

73

are "entitled to relief" such that the merits are necessarily decided prior to class certification).

Defendants additionally contend that if the Court preliminarily certifies a collective, it should do so only for the Citi branches worked in by the named Plaintiffs. Plaintiffs' affidavits, as well as those submitted by opt-in plaintiffs, support certification of a national collective. In particular, as discussed more fully above in Part III.B, Plaintiffs have submitted affidavits as to the similar nature of their job duties, that they were not paid overtime pay despite working the same job duties both before and after Citi's national reclassification of loan consultants as non-exempt, that Citi utilized national and uniform pay policies with regards to them, and that they were aware, by way of Citi's nationwide conference calls and memoranda, that other loan consultants were subject to the same nationwide Citi policies. Accordingly, at least at this preliminary stage, Plaintiffs have established a sufficient factual nexus between themselves and Loan Consultants in other Citi offices.  This is particularly the case in light of Defendants' motion to dismiss, transfer, or a stay on the grounds that "identical" claims have been made by a Loan Consultant in the Florida-based Corgosinno action.

Based on the parties' arguments and the findings made above, the Court limits the purported FLSA collective definition to "persons employed by Defendants Citigroup Inc., Citibank, N.A., and/or CitiMortgage Inc. as Home Lending Specialists, Loan Consultants, and/or other similarly titled positions engaged in the primary duty of assisting customers with home mortgage and/or re-finance applications for the period of three years prior to April 8, 2011 until the present." See Lundquist v. Sec. Pac. Auto. Financial Servs. Corp., 993 F. 2d 11, 14-15 (2d Cir. 1993) (court is empowered to adopt an appropriate class definition under Rule 23); see also Bifulco, 262 F.R.D. at 215; Thompson, 2010 WL 3394188 at *7-8.

## D.  Notice

Plaintiffs further request that the Court authorize notice of this action to be sent to all potential members of the FLSA Collective.  Plaintiffs estimated that there are "hundreds" of potential opt-in members nationally. (Pls. Cert. Mem. 4.)

As earlier discussed, though the FLSA does not expressly provide a district court with the authority to order notice, "[t]he Second Circuit has recognized a district court's authority to order that notice be given to potential members of

75

a plaintiff class in actions under this section (generally referred to as 'collective actions'), pursuant to the opt-in provisions of the FLSA." Rubery, 569 F. Supp. 2d at 335 (internal citation omitted). "By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative. Both the parties and the court benefit from settling disputes about the content of the notice before it is distributed." Hoffman-La Roche, 493 U.S. 165, at 172.

In accordance with the terms of this Order, the parties shall submit a joint proposed notice to the Court for approval in order to ensure that the drafting and distribution of the notice is timely, accurate and informative. See Sexton, 2009 WL 1706535, at *13 ("the parties shall submit a joint proposed notice to the Court for approval"); Mendoza, 2008 WL 938584 at *4 ("notice should be jointly prepared"); Chowdhury, 2007 WL 2873929, at *6 ("the Court expects the parties to work out those issues on their own, and provide the Court with the stipulated notice"); Scholtizek v. Eldre Corp., 229 F.R.D. 381 (W.D.N.Y. 2005) (same); Carter v. Newsday, Inc., 76 F.R.D. 9, 16 (E.D.N.Y. 1976) (same).

This jointly proposed notice shall be submitted within thirty (30) days of the date of this Order.

**E.   Disclosure of Names and Contact Information of Potential Opt-In Plaintiffs**

Plaintiffs additionally request the Court "direct Defendants to produce the names, last known addresses, telephone numbers (both home and mobile), e-mail addresses, and dates of employment for all persons employed by Citi as a Home Lending Specialist, Loan Consultant, and any similar mortgage lending position in any Citi office nationwide, from a period three years prior to the filing of this Complaint to the present." (Pls. Cert. Mem. 16.)   As has been noted by a number of courts in this circuit, "[c]ourts often grant this kind of request in connection with a conditional certification of an FLSA collective action."   Sexton, 2009 WL 1706535, at *13; see also Vaughan, 2010 WL 1528521, at *9 ("Courts within the Second Circuit typically grant this type of request when granting a motion for conditional certification of an FLSA collective action"); Bifulco, 262 F.R.D. at 216 (same); Rubery, 569 F. Supp. 2d 334, 338; Lynch, 491 F. Supp. 2d at 371; Sherrill, 487 F. Supp. 2d at 350; Chowdhury, 2007 WL 2873929, at *2; Anglada, 2007 WL 1552511, at *7; Hens, 2006 WL 2795620, at *5.   This

77

Court concludes that such a request is likewise appropriate in this case.

In addition, Plaintiffs request the same contact information for all persons similarly employed in any Citi office located in New York State from a period six years prior to the filing of this Complaint. While the FLSA has a maximum three-year statute of limitations, see 29 U.S.C. § 255, Plaintiffs request contact information for New York employees going back six years because the state law claims, over which the Court may exercise supplemental jurisdiction, are governed by a six-year statute of limitations. See 28 U.S.C. § 1367; Shahriar v. Smith & Wollensky Restaurant Group, Inc., -- F.3d -- , 2011 WL 4436284 (2d Cir. Sept. 26 2011).

In this context, courts in this Circuit have granted both three and six-year periods. See Avila v. Northport Car Wash, Inc., 10 CV 2211 (LDW) (AKT), 2011 WL 833642 (E.D.N.Y. 2011); Cano v. Four M Food Corp., No. 08-CV-3005, 2009 WL 5710143, at *10 (E.D.N.Y. Feb. 3, 2009); Alcantara v. CNA Management, Inc., 264 F.R.D. 61, 66-67 (S.D.N.Y. 2009); Guzman v. VLM, Inc., 07 Civ 1126 (JG) (RER), 2007 WL 2994278, at *5 (E.D.N.Y. Oct. 11, 2007); Wraga v. Marble Lite, Inc., No. 05-CV-5038, 2006 WL 2443554, at *3 (E.D.N.Y. Aug. 22, 2006);

78

Harrington v. Educ. Mgmt. Corp., 146 Lab. Cas. (CCH) 34554 (S.D.N.Y. 2002); Realite v. Ark Restaurants Corp., 7 F. Supp. 2d 303, 308 (S.D.N.Y. 1998). According to Plaintiffs, the number of Loan Consultants currently working in the tri-state area is 78. (See Raniere Decl. ¶ 17 (Dkt. No. 20); Bodden Decl. ¶ 17 (Dkt. No. 19); Singer Decl. ¶ 17 (Dkt. No. 24).) As the number of New York is presumably a subset of that figure, the total potential plaintiffs to whom this larger period would apply does not appear to be very large, even withstanding turnover during the six-year period. The Court finds it appropriate and in the interest of judicial economy in this case to allow the Plaintiffs to obtain the relevant contact information going back for a six-year period for potential plaintiffs who worked out of Citi offices in New York "even if some recipients of the notice will have claims that are time-barred under the FLSA." Cano, 2009 WL 5710143, at *10.

Providing such information here would be neither unduly burdensome nor disruptive to Defendants. See Sexton, 2009 WL 1706535, at *13 (citing Hallissey, 2008 WL 465112, at *3). Defendants are hereby ordered to provide this information to Plaintiffs within forty-five (45) days of this Order.

**Conclusion**

Based upon the foregoing, Defendants' motion to dismiss, or in the alternative transfer or stay, is denied; Defendants' motion to compel arbitration of the claims of plaintiffs Raniere and Bodden is denied; and Plaintiffs' motion for conditional certification of an FLSA collective and related relief is granted.

It is so ordered.

New York, NY
November 2 2 2011

ROBERT W. SWEET
U.S.D.J.